IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES EQUAL EMPLOYMENT ) | |
| OPPORTUNITY COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 04-0877-CV-W-FJG |
| ) | |
| CITY OF INDEPENDENCE, MISSOURI, ) | |
| ) | |
| Defendants. ) | |

# ORDER

Currently pending before the Court is defendant's Motion for Summary Judgment (Doc. # 51).

## I. BACKGROUND

Since 1998, the City of Independence, Missouri has had a written policy that allows qualified individuals who are out of accumulated paid leave and have suffered a catastrophic, debilitating or long-term injury to draw up to 1040 hours of donated leave from other City employees who have accrued paid leave. The Leave Donation program became part of the City's Personnel Policies and Procedures Manual on March 16, 1998. There are several exclusions to the policy: a) the employee must not be on probationary status; b) the employee must have exhausted all sick and vacation leave and compensatory time; c) the employee must not be receiving or be eligible to receive disability compensation from the City's long-term disability carrier or other city-funded insurance programs; d) the employee must be eligible to earn and use accrued sick leave

hours; e) the employee must not be eligible for regular retirement.  An employee is eligible to receive regular retirement if they are a) 60 years of age or older and b) vested in the LAGERS pension plan. An employee is vested under the LAGERS pension plan if they have worked for the City or another public employer that uses LAGERS, full time for five years or more.  After six months or 1040 hours of time away from work due to an illness or injury, an employee is eligible for disability compensation through the City's long-term disability carrier.  For each full time employee, the City pays a premium for disability insurance and pays money into the employee's retirement program.  When an employee is on donated leave, the City continues to pay money into the employee's retirement program.

Richard Hopkins worked for the City of Independence from 1993 until his retirement which went into effect on June 1, 2003.  In 1994, Hopkins began working full time as a Code Compliance officer.  Code Compliance officers receive complaints from citizens and go out into the field to investigate the complaints. Compliance officers are provided vehicles by the City to use in performing their duties.  Driving a vehicle is an essential part of the Code Compliance officer's position.

On November 1, 2002, Hopkins experienced a problem where his heart was beating too quickly.  He was taken to the hospital on the following Monday and he was hospitalized for approximately three to four days.  After experiencing this problem, Hopkins' physicians installed a device inside his chest called a "defibrillator pacemaker." He was told not to drive for six months. The defibrillator pacemaker shocks the heart if it gets out of rhythm.  After this device was implanted, from November 2002 until April

2003, Hopkins experienced multiple episodes of ventricular tachycardia or "VT." This continued until he was properly medicated, which was in April 2003. After each episode of sustained VT, Hopkins' driving restriction was pushed back another six months. On November 7, 2002, Hopkins sent an e-mail to his supervisor and various other city employees stating that he would be unable to drive for six months which "halts a major function of my essential duties." He also stated that "I would be allowed to drive again, only if I do not have a recorded episode of a major Ventricular tachycardia during that restricted (6) six month period." On November 13, 2002, plaintiff submitted his Family Medical Leave Act (FMLA) paperwork. In a letter to his supervisor he stated that he would be unable to drive until May 23, 2004 if he does not have another episode. Hopkins was placed on FMLA leave on November 4, 2002. He used all the paid vacation and sick leave he accrued by November 21, 2002. On November 21, 2002, Lenear Brownlee, the City's Human Resources Administrator called plaintiff to inform him that he could not participate in the Leave Donation Program. He told plaintiff, "I didn't know you were that old." Plaintiff replied, "What do you mean?" Brownlee responded, "Well, you're of retirement age, Richard, you're over 60. You can't draw donated leave time." Hopkins met with Browlnee, his supervisor and other city employees on November 21, 2002 to discuss his options. During the meeting, there was discussion of Hopkins working part-time doing clerical work, retirement and the possibility of a reasonable accommodation under the ADA. Hopkins FMLA leave expired on January 27, 2003. On February 3, 2003, plaintiff sent a letter to Brownlee and his supervisor and the Human Resources Director stating that his doctor had not yet released him and asked for an

3

extension of his FMLA leave. He stated that he expected to be released the first week of May 2003. On February 20, 2003, the City approved Hopkins' request for an extension of his FMLA leave until May 2003. Hopkins did not learn his request for an extension had been granted. On February 27, 2003, plaintiff applied for long term disability through the City's insurance carrier. On March 14, 2003, Hopkins faxed a letter to Larry Blick, explaining that his driving restriction had been extended to August 24, 2003. On March 24, 2003, City officials met with Hopkins to discuss his options. On March 27, 2003, plaintiff's supervisor wrote to plaintiff documenting what had occurred at the meeting. The letter states that Hopkins request for an extension of his leave until August 24, 2003 had been denied and his options were as follows: 1) resignation; 2) an Accommodation Request form completed by April 7, 2003; 3) retirement and 4) long-term disability. The letter acknowledged that the City had already received Hopkins' request for long-term disability. Plaintiff was given until April 15, 2003 in which to select one of the above referenced options. On April 2, 2003 plaintiff faxed his request for a reasonable accommodation to the City. On April 4, 2003, Hopkins submitted his retirement papers "under coercion and threat of losing [his] [health] benefits." On April 14, 2003, plaintiff's supervisor prepared a memorandum to the ADA committee stating that it would be an undue hardship for the City to keep Hopkins employed in the Code Compliance Division. On April 15, 2003, plaintiff's supervisor sent a letter to Hopkins stating that the City was not requiring him to chose the option of retiring and would hold his paperwork until April 28, 2003. Hopkins retirement was effective on June 1, 2003. Hopkins' claim for long-term disability was approved on June 20, 2003 and was effective

on May 1, 2003. The City advertised a position as a Property Maintenance officer, the new title for Code Compliance officer, on April 8, 2005. Hopkins applied for the position, but did not receive it. Hopkins applied after the deadline for submitting applications and the City does not interview any applicants who do not apply by the deadline. The City has filled four vacancies for Hopkins' former position in 2005. Two of the four employees hired are over the age of forty.

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. 242, 248 (1986). In Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), the Court emphasized that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may

5

be reasonably drawn from the evidence. Matsushia, 475 U.S. 574, 588; Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

### III. DISCUSSION

**A. Disparate Treatment - Individual Claim/Pattern and Practice Claim/MHRA Claim**

The City notes that in Hopkins' Complaint, he argues that the City's conduct "evidences a pattern and practice of discrimination." However, the City observes that the EEOC's Complaint charges only that the City has "engaged in unlawful employment practices . . ." The City argues that this distinction is important because there is a higher burden of proof for pattern and practice cases as opposed to an individual age discrimination case. Thus, the City states that because Hopkins' "pattern and practice" claim must meet a higher burden than the EEOC's traditional ADEA claim the City will focus on the EEOC's claim for purposes of the summary judgment motion.

The City then proceeds to analyze the disparate treatment claim under the traditional three part burden shifting scheme established in McDonnell Douglas v. Green, 411 U.S. 792, 804 (1973) and argues that the EEOC cannot make out a prima facie case.

However, plaintiffs in opposition state that the leave donation program is facially discriminatory and therefore it is direct evidence of age discrimination. Accordingly, plaintiffs state that analysis under the McDonnell Douglas standard is inappropriate and instead should be analyzed under the standard established in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Therefore, the Court will analyze plaintiffs' claims under the Price Waterhouse standard. The Court also notes that Hopkins has raised a

6

Missouri Human Rights Act claims. As the Court in Overlie v. Owatonna Independent School Dist. No. 761, 341 F.Supp.2d 1081, 1091 (D.Minn. 2004) noted, "[a]ge discrimination claims under the MHRA are considered under the same analysis as claims under the ADEA."

In Erickson v. Farmland Industries, Inc., 271 F.3d 718 (8th Cir. 2001), the Court stated:

> According to Justice O'Connor's controlling concurrence in Price Waterhouse, once a discrimination plaintiff shows 'by direct evidence that an illegitimate criterion was a substantial factor' in the decision at issue, 'the burden then rests with the employer to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor.'

Id. at 724, quoting Price Waterhouse, 490 U.S. 228, 276, 109 S.Ct. 1775.

Plaintiffs argue that where age is the trigger for denial of an employment benefit, the policy discriminates based on age. Plaintiffs cite three cases in support of their position, Auerbach v. Board of Education of the Harborfields Central School Dist. of Greenlawn, 136 F.3d 104, 107-108 (2d Cir. 2004); Huff v. UARCO, 122 F.3d 374, 387-88 (7th Cir. 1997) and EEOC v. Borden's Inc., 724 F.2d 1390 (9th Cir. 1984).

Plaintiffs state that in Auerbach, the Court determined that an early retirement plan which defined eligibility for a lump-sum benefit by reference to age and years of service constituted disparate treatment based on age. However, as the City points out, what the Court in Auerbach actually held was that the plaintiffs had met the de minimis standard to establish a prima facie case because age was a trigger for the denial of the employee benefits. However, the Court ultimately concluded that the early retirement

7

incentive plan was valid because it was voluntary, employees were given a reasonable period of time to consider their options and make an informed choice and it did not arbitrarily discriminate on the basis of age because it did not decrease benefits as the age of the participant increased.

In Huff v. UARCO, 122 F.3d 374 (7th Cir. 1997), plaintiffs argue that the Court held that the pension plan which gave a lump sum payment to employees terminating employment before becoming eligible for early retirement but denied the lump sum option to employees terminating after becoming eligible violated the ADEA. However, the Court did not conclusively determine this issue and instead remanded the case for proceedings consistent with the opinion. The Court observed:

> [u]nder the policy, no worker under fifty-five would ever be denied a lump sum payout, regardless of that worker's years of service. But for the age-related restriction, certain workers over fifty-five would be eligible for the lump sum payout. This is not a case where there is merely a correlation between age and the denial of a particular benefit. UARCO's policy draws an express line between workers over fifty-five and those under. In other words, this is not a case of disparate impact . . . but rather of disparate treatment. UARCO is not, therefore, entitled to summary judgment on this claim.

Id. at 388 (internal citations omitted).

As the City notes in its reply suggestions, there is no express age dividing line in this case. The City observes that many of its employees under age sixty are not eligible to receive donated leave for various reasons, while some employees who are over the age of sixty, but not vested in LAGERS, are eligible to receive donated leave.

The final case which plaintiff rely upon is EEOC v. Borden's Inc., 724 F.2d 1390 (9th Cir. 1984). In that case, Borden's severance pay policy denied a benefit to certain

8

employees because they were age fifty-five or older. Bordens argued that the policy considered an employee's retirement status as well as the person's age. However, the Court did not find that argument persuasive and stated:

> We have twice held that an employer discriminates 'because of' age whenever age is a 'but for' cause of discrimination. . . . Age was a 'but for' cause or necessary condition for the denial of severance pay to Borden's retireable employees, since only employees 55 or older were eligible for retirement. Borden's distinction between age and retireability is especially hollow here, where 15 out of 16 employees 55 or older had served the 10 years necessary to qualify them for retirement.

Id. at 1393 (internal citations omitted). The City notes that although this case might be helpful to plaintiffs, it predates the Supreme Court's decision in Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993) by almost ten years. As the City correctly notes, Hazen Paper significantly clarified and diminished the age/proxy doctrine. The Supreme Court in that case noted that the "Courts of Appeals repeatedly have faced the question whether an employer violates the ADEA by acting on the basis of a factor, such as an employee's pension status or seniority, that is empirically correlated with age. . . . We now clarify that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." Id. at 608-09. The Court continued:

> [w]hen the employer's decision *is* wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is. Pension plans typically provide that an employee's accrued benefits will become nonforfeitable, or 'vested,' once the employee completes a certain number of years of service with the employer. . . . On average, an older employee has had more years in the work force than a younger employee, and thus may well have accumulated more years of service with a particular employer. Yet an employee's age is analytically
9

>distinct from his years of service. An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, . . . may have worked for a particular employer his entire career, while an older worker may have been newly hired. Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily "age based."

Id. at 611. Additionally, other courts in the Eighth circuit have followed the lead of Hazen Paper. See, Cooney v. Union Pacific Railroad Co., 258 F.3d 731, 735-36 (8th Cir. 2001); E.E.O.C. v. McDonnell Douglas Co., 191 F.3d 948, 951 (8th Cir. 1999); Hannebrink v. Brown Shoe Co., 110 F.3d 644 (8th Cir. 1997). Accordingly, the Court finds that the City's leave donation program is not facially discriminatory. Although the years of service may correlate with age to deny persons who are age sixty and older, the ability to participate in the program, it is also true that employees who are over age sixty, but who are not vested are eligible to draw donated leave. Additionally, there are employees who are younger than sixty who for some other reasons may not be able to participate in the program. Therefore, the Court finds that the restrictions contained in the City's Leave Donation program are motivated by factors other than age (the desire to limit employee's to only one benefit at a time), and although this factor may correlate with age, it does not constitute age discrimination. As the Court has determined that the City's policy did not discriminate against Hopkins on an individual basis, the Court also rejects Hopkins' pattern and practice claim. Accordingly, the Court hereby **GRANTS** defendant's Motion for Summary Judgment on plaintiffs' Disparate Treatment Claim, MHRA Claim and Pattern and Practice Claim.

### B. Constructive Discharge

Plaintiffs state that the City constructively discharged Hopkins when they 1) required him to select an employment option in April 2003, before the expiration of his extended leave; 2) failed to present Hopkins with all of his employment options when it gave him the ultimatum in March 2003 and also when they 3) did not accept or respond to Hopkins' selection of options other than retirement or resignation. Plaintiffs argue that all of the City's conduct leading up to Hopkins discharge demonstrates that the City was focused solely on removing Hopkins from his employment, thereby resulting in his constructive discharge.

The City in opposition states that all of its actions were motivated by Hopkins' inability to drive a motor vehicle due to his heart condition. The City states that even if Hopkins had been eligible to receive donated leave, he would still have been required submit his Family Medical Leave Act paperwork when it became apparent that he was going to be away from work for an extended period. The City states that it would have set the April 15, 2003 deadline for Hopkins regardless of whether he was receiving donated leave or not. The City states, "[d]onated leave is a benefit qualified employees can draw while they are out on unpaid leave. Eligibility for donated leave does not guarantee an employee unlimited unpaid leave." (Defendant's Reply Suggestions, p. 24).

Plaintiffs note that "[c]onstructive discharge occurs when an employee intentionally creates a work environment so intolerable as to compel a reasonable employee to quit, and the employee does in fact quit." Tadlock v. Powell, 291 F.3d 541, 547 (8th Cir. 2002). In this case, the facts demonstrate that the City worked with Hopkins over a period of several months in an effort to find a solution. However, Hopkins was not clearly

11

expressing to the City when or if he would be able to resume driving. From November 5, 2002 until February 3, 2003, Hopkins on at least three occasions conveyed to the City that he could return to work as early as May 2003. The City then granted Hopkins until May 2003 in which to return to work. However, in March 2003, Hopkins or his doctor, informed the City on at least three occasions that he could not return to work until August 2003 or later. In the midst of this confusion, the City met with Hopkins and gave him four options: 1) resignation; 2) complete an accommodation form; 3) retirement and 4) long-term disability. The City gave Hopkins until April 15, 2003 to make a decision. This was approximately two weeks before his unpaid leave was to expire. On April 4, 2003, plaintiff submitted his retirement paperwork, stating that he was doing so under coercion and threat of losing his benefits. However, the City on April 15, 2003 wrote to plaintiff and told him that he was not required to retire and informed him that they would hold his retirement papers until April 28, 2003 if he wished to reconsider. Thus, it was clear that the City was not forcing plaintiff to retire. The facts demonstrate that the City did not create an environment which was so intolerable that a reasonable employee would have been compelled to quit. Rather, the City made a reasoned decision based on the information which the plaintiff provided to them. Based upon this information, the City acted reasonably and did not constructively discharge plaintiff. Accordingly, defendant's Motion for Summary Judgment on plaintiff's Constructive Discharge claim is hereby **GRANTED**.

### C. Disparate Impact

The City argues that they are entitled to summary judgment on the EEOC's

disparate impact theory because these cases are viable under the ADEA only if they affect the entire class of persons protected by the ADEA. In other words, the City argues that the Leave Donation Program would have to affect all persons over the age of forty who work for the City of Independence. The City notes that the EEOC has previously requested the Eighth Circuit to expand its recognition of disparate impact claims under the ADEA to include claims on behalf of sub-groups, but the Eighth Circuit has declined to do so. In EEOC v. McDonnell Douglas Corp., 191 F.3d 948 (8th Cir. 1999), the Court noted, "[t]o prevail on a disparate-impact claim, a plaintiff must prove, as a threshold matter, that the challenged employment practice, while facially neutral, has a disparate impact on certain employees because of their membership in a protected group. . . . Under the ADEA, the protected group consists of individuals who are at least 40 years of age." Id. at 950 (internal citations and quotations omitted). However, in that case, the EEOC was not claiming that the reduction in force had a disparate impact on the entire class of persons protected by the statute, all of those individuals over 40, but rather just those individuals who were 55 years of age and older. The Eighth Circuit stated, "[t]he EEOC is thus asking us to expand our recognition of disparate-impact claims under the ADEA to include claims on behalf of subgroups of the protected class. We decline to do so." Id.

In opposition, the EEOC argues that McDonnell Douglas is factually distinguishable because it involved a reduction in force claim, while this case involves a leave donation program. The EEOC also argues that in McDonnell Douglas, the Eighth Circuit held that plaintiff could not use statistics to create a subgroup, because it would

13

lead to claims based on subjective determinations, rather than objective findings. The EEOC argues that in the present case, the City's program objectively defines the group of older workers who are suffering discrimination. Because of these dissimilarities, the EEOC argues that this case is not controlling.

This Court disagrees and finds no basis on which to distinguish McDonnell Douglas. Regardless of what type of claim is being asserted, the EEOC is still attempting to carve out or create sub-groups, even though it is not using statistics as was done in the McDonnell Douglas case. However, that was only one rationale that the Eighth Circuit relied upon. The Court also noted that McDonnell Douglas had relied on criteria such as retirement eligibility, salary, and seniority in making the layoff decisions. The Court stated, "[w]e have held that employment decisions motivated by factors other than age (such as retirement eligibility, salary, or seniority), even when such factors correlate with age, do not constitute age discrimination). . . . We certainly do not think that Congress intended to impose liability on employers who rely on such criteria just because their use had a disparate impact on a subgroup." Id. at 951 (internal citations omitted). Therefore, the Court hereby **GRANTS** defendant's Motion for Summary Judgment on plaintiff's Disparate Impact Claim.

## IV. CONCLUSION

Accordingly, for the reasons stated above, the Court hereby **GRANTS** defendant's Motion for Summary Judgment (Doc. # 51) and **DENIES AS MOOT** plaintiff's Motion in Limine (Doc. # 83), and Defendant's Motions in Limine (Docs. # 85, 86, 87, 88,

14

89, 90 and 91).


Date: October 31, 2005                      **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                         Fernando J. Gaitan, Jr.
United States District Judge